## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| MICHAEL SAYIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   **Case No. 19-cv-11845-DJC** |
| | ) |
| VERIZON NEW ENGLAND INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

## MEMORANDUM AND ORDER

**CASPER, J.**                                                     **February 8, 2022**

## I.      Introduction

Plaintiff Michael Sayian ("Sayian") has filed this lawsuit against Defendant Verizon New England Inc. ("Verizon") alleging claims for discrimination under Mass. Gen. L. c. 151B and Title I of the Americans with Disabilities Act ("ADA") (Counts I and III), retaliation under 29 U.S.C. § 2612 of the Family and Medical Leave Act ("FMLA") and Mass. Gen. L. c. 151B, § 4(4) (Counts II and V) and intentional infliction of emotional distress (Count IV). D. 1-1. Verizon now moves for summary judgment. D. 30. For the reasons stated below, the Court ALLOWS the motion.

## II.      Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp.,

1

217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  "A genuine issue exists where a reasonable jury could resolve the point in favor of the nonmoving party."  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citation and internal quotation marks omitted).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are undisputed unless otherwise noted and are drawn from Verizon's statement of undisputed material facts, D. 32, Sayian's response and statement of additional material facts, D. 35, and accompanying documents.

### A.    Staffing Issues and Initial Accommodation

Sayian began working at Verizon in 1998 as a central office technician ("COT") at a location in Taunton, Massachusetts.  D. 32 ¶ 2; D. 35 at 1 ¶ 2.  His responsibilities included operating and maintaining Verizon's switching technology, data network, computer processing equipment and related peripherals, as well as installing, testing and maintaining various equipment.  D. 32 ¶¶ 4–5; D. 35 at 2 ¶¶ 4–5.  In his role as a COT, Sayian belonged to a union.  D. 32 ¶ 6; D. 35 at 2 ¶ 6.  The collective bargaining agreement ("CBA") between Verizon and the union governed the terms and conditions of his employment.  D. 32 ¶ 6; D. 35 at 2 ¶ 6.

Verizon assigns COTs to one of three shifts:  a day shift from 7:00 a.m. to 4:00 p.m., an evening shift from 4:00 p.m. to 12:00 a.m. or a night shift from 12:00 a.m. to 7:00 a.m.  D. 32 ¶ 7; D. 35 at 2–3 ¶ 7.  From 1998 to 2011, Sayian worked the day shift.  D. 32 ¶ 8; D. 35 at 3 ¶ 8.  In 2011, Verizon assigned Sayian to the evening shift due to staffing issues.  D. 32 ¶ 8; D. 35 at 3 ¶ 8.  In March 2013, Sayian requested return to the day shift as an accommodation to his depression, anxiety and alopecia.  D. 32 ¶ 9; D. 35 at 3 ¶ 9, 13 ¶ 4.  Because it needed a COT on the day shift at the time, Verizon assigned Sayian to the day shift effective December 16, 2013. D. 32 ¶ 10; D. 35 at 3 ¶ 10.

### B.    Temporary Reassignment

The COT function has been shrinking at Verizon for years.  D. 32 ¶ 11; D. 35 at 4 ¶ 11. Given the declining number of COTs and the need to be available to customers at all hours, in 2016 Verizon sought to rebalance the staffing of its COTs in Taunton between the day shift and the evening and night shifts.  D. 32 ¶ 12; D. 35 at 4 ¶ 12.

Under the CBA, Verizon assigns shift preferences based upon an employee's seniority and "rating."  D. 32 ¶ 14; D. 35 at 4 ¶ 14.  An employee is "rated" if they have passed a professional skills examination.  D. 32 ¶ 14; D. 35 at 4 ¶ 14.  Sayian never sat for the examination and, therefore, was not a rated COT.  D. 32 ¶ 14; D. 35 at 4 ¶ 14.  The CBA's terms dictate that rated COTs receive their shift assignments in order of seniority, and then non-rated COTs receive their shift assignments in order of seniority.  D. 32 ¶ 15; D. 35 at 4–5 ¶ 15.  The CBA's work scheduling provision states:  "Subject to the requirements of the service, seniority of rating, or seniority of service where ratings are not involved, shall govern the assignment of day or night tours and/or hours assigned within those tours, in the work group involved."  D. 32-3 at 9.

Verizon did not receive enough volunteers for the evening and night shifts based upon its

initial canvass and ultimately had to re-canvass the workforce.  D. 32 ¶ 16; D. 35 at 5 ¶ 16.  In discussions with the union, Verizon agreed to offer a second canvass in September 2016 for a temporary, six-month assignment, hoping that might engender additional volunteers for the night and evening shifts.  D. 32 ¶ 17; D. 35 at 5 ¶ 17.  The union had indicated that five COTs from another department could be transferred to Sayian's team to staff the evening and nigh shifts.  D. 32 ¶ 17; D. 35 at 5 ¶ 17.

Following the canvass, Verizon assigned Sayian to the evening shift effective October 2, 2016.  D. 32 ¶ 18; D. 35 at 5 ¶ 18.  Verizon told Sayian that it could not assign him to the day shift because other union members with a preference for the day shift were entitled to that shift under the CBA, either because they were rated or because they were non-rated but had more seniority that Sayian.  D. 32 ¶ 18; see D. 35-3.  Therefore, according to Verizon, the only way to grant Sayian a COT day shift would have been to assign another employee out of the day shift in violation of that employee's rights under the CBA.  D. 32 ¶ 18.  Verizon transferred at least one other COT with more seniority than Sayian out of the day shift due to the rebalancing.  D. 32 ¶ 19; D. 35 at 6 ¶ 19.

### C.    <u>Reassignment Becomes Permanent</u>

As of early 2017, Verizon was unsuccessful in transferring five additional COTs onto Sayian's team.  D. 32 ¶ 20; D. 35 at 6 ¶ 20.  Verizon consequently conducted a third canvass of the workforce, this time for permanent shift assignments.  D. 32 ¶ 20; D. 35 at 6 ¶ 20.  By February 2018, Verizon made Sayian's temporary reassignment to the evening shift permanent.  D. 32 ¶ 21; D. 35 at 6 ¶ 21.  As of February 2018, no non-rated COTs with less seniority than Sayian worked the day shift.  D. 32 ¶ 25; D. 35 at 7 ¶ 25.

Sayian again sought transfer to the day shift in February 2018.  D. 32 ¶ 22; D. 35 at 6 ¶ 22.

On April 5, 2018, Verizon informed Sayian of its decision not to reassign his shift because doing so would conflict with the CBA's seniority provisions and impact the rights of other employees. D. 32 ¶¶ 24, 26; see D. 32-1 at 12–13.   Verizon stated that it was open to exploring other alternatives to address Sayian's disabilities, including time off to attend appointments, D. 32 ¶ 26; D. 32-1 at 13, but that it could not change Sayian's shift as a reasonable accommodation, D. 35 at 7–8 ¶ 26; D. 32-1 at 13.  Sayian did not propose any other accommodations at the time and insisted that only a transfer to the day shift would suffice.  D. 32 ¶ 27; see D. 32-2 at 24–26.

On April 9, 2018, Sayian emailed Verizon's workplace accommodations team, stating that he needed to be assigned to the day shift because the evening shift assignment was "negatively affecting [his] life" and "causing . . . stress, depression and anxiety."  D. 32 ¶ 29; D. 35 at 8 ¶ 29. Sayian added:  "I honestly don't care about the bargaining agreement. . . . [T]he ONLY solution is to put [me] back onto my hired position on dayshift."  D. 32-1 at 12.  Verizon granted Sayian a leave of absence effective April 2018 and he received short-term disability benefits until at least August 2018.  D. 32 ¶ 31; D. 35 at 8–9 ¶ 31.

### D.   Transfer to New Position and Termination

In August 2018, Verizon transferred Sayian to a day shift position as a service representative in the Taunton office, the only available position that met Sayian's medical restrictions.  D. 32 ¶ 32; D. 35 at 9 ¶ 32.  The transfer was consistent with the CBA, which provides that where "an employee claims an inability to perform all of the duties associated with the employee's job assignment because of a disability," Verizon "may transfer the employee to another job assignment with a rate of pay equal to or lower than the rate of pay of the employee's pre-disability job assignment."  D. 32 ¶ 33; D. 35 at 9 ¶ 33.  The new position's hours would have met Sayian's medical needs, allowing him the opportunity to work the day shift, and would have

met Verizon's need for a service representative on the day shift in Taunton.  D. 32 ¶ 34.[1]

The service representative position was different from the COT position, having distinct and unrelated essential duties.  D. 35 at 15 ¶ 21.  Sayian viewed the proposed transfer as a demotion and felt that it would force him to suffer the embarrassment of working alongside his former coworkers in an inferior position.  Id. at 15 ¶ 26; see D. 35-1 at 25–26.  The service representative position was of a lower grade under the CBA than Sayian's COT position, although the CBA would have protected Sayian's compensation for three years and three months, after which it would undergo a gradual reduction over the balance of the fourth year.  D. 32 ¶ 35; D. 35 at 10 ¶ 35.  Still, the new position would immediately have reduced the number of hours Sayian worked each week and would not have allowed him to work overtime.  D. 35 at 15 ¶¶ 25–26; see D. 35-1 at 19.  Sayian would have been eligible to bid on open COT jobs that became available during this time and would have been eligible to respond to future canvasses for COT positions and, if eligible, receive a day shift assignment.  D. 32 ¶ 36; D. 35 at 10 ¶ 36.

Sayian refused the service representative position, D. 32 ¶¶ 37, 39; D. 35 at 10 ¶¶ 37, 39, and requested an extension on his leave of absence, which Verizon denied, D. 35 at 16 ¶ 31; see D. 35-1 at 28; D. 35-6 at 9–10.[2]  In November 2018, Verizon sent a letter to Sayian reminding him that he needed to report to work in the service representative position by November 19, 2018.  D. 32 ¶ 40; D. 35 at 11 ¶ 40.  Sayian did not report to work as of that date.  D. 32 ¶ 41; D. 35 at 11

---

[1] Sayian purports to dispute that the transfer addressed his medical restrictions but admits that the new position's hours would have met his medical needs.  D. 35 at 9–10 ¶ 34 (citing D. 35-1 at 21–22).

[2] Sayian asserts that he also requested return to his evening shift as a possible reasonable accommodation.  D. 35 at 8 ¶ 27.  While Sayian stated at one point in his deposition that he "believe[d]" he requested to return to the evening shift in November 2018, D. 36-1 at 3, he later revised that testimony and stated that he did not communicate with Verizon between November 1, 2018 and December 17, 2018, id. at 5–7.

¶ 41.  Verizon terminated Sayian's employment effective December 17, 2018.  D. 32 ¶ 41; D. 35 at 11 ¶ 41.

## IV.    Procedural History

Sayian commenced this action in Bristol Superior Court on or about July 29, 2019.  D. 1-1. Verizon removed the case to this Court on August 30, 2019.  D. 1.  Verizon now moves for summary judgment.  D. 30.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 38.

## V.    Discussion

### A.    Discrimination:  Reasonable Accommodation (Counts I and III)[3]

Sayian claims that Verizon failed to provide a reasonable accommodation by refusing to transfer him back to the day shift as a COT in 2018 and that his transfer to the service representative position constituted a demotion.  D. 1-1 ¶¶ 46, 56–57.  As a preliminary matter, Sayian argues that this court should apply the burden shifting framework, see D. 34 at 5, which generally applies in employment discrimination cases lacking direct evidence of discriminatory animus.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973); see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104–05 (1st Cir. 2005); Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky

---

[3]  In their memoranda, the parties intermingle discussion of Sayian's failure to accommodate and discrimination claims.  These issues, however, require different analyses so courts analyze them separately.  See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104–08 (1st Cir. 2005); Manning v. Abington Rockland Joint Water Works, 357 F. Supp. 3d 106, 115 (D. Mass. 2019) (explaining that "courts distinguish between [classic] disability discrimination claims and failure to accommodate claims, with each claim requiring different elements to be met").  Accordingly, the Court here addresses the issues in turn.  Further, because the applicable state and federal statutes at issue are analogous and similarly construed, the Court considers both statutes in tandem.  See Flaherty v. Entergy Nuclear Operations, Inc., No. 16-cv-11667-FDS, 2018 WL 3352957, at *15 (D. Mass. July 9, 2018) (citing Labonte v. Hutchins & Wheeler, 424 Mass. 813, 816 n.5 (1997)) (stating that the Massachusetts antidiscrimination statute "is analogous to the ADA and is generally construed the same as federal law").

& Popeo, P.C., 474 Mass. 382, 396, 406 (2016).  The First Circuit, however, has stated that "whether a requested accommodation is reasonable or whether it imposes an undue hardship are questions typically proved through direct, objective evidence.  Accordingly, . . . the McDonnell Douglas model does not apply to ADA discrimination claims based on failure to reasonably accommodate."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 n.3 (1st Cir. 2001) (citing Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999)).  The Court, therefore, applies the First Circuit's reasonable accommodation framework, see Tobin, 433 F.3d at 106–07, rather than the McDonnell Douglas framework to the extent that Sayian bases his discrimination claims on Verizon's alleged failure reasonably to accommodate his disability, see D. 1-1 ¶¶ 46, 56–57.

"Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business."  Tobin, 433 F.3d at 106 (citing 42 U.S.C. § 12112(b)(5)(A)).  To survive summary judgment on a reasonable accommodation claim, a plaintiff must "produce enough evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the employer], despite knowing of his disability, did not reasonably accommodate it."  Id. at 107.  Here, prongs one and two are undisputed.  See D. 31 at 3.  The issue, therefore, is whether providing Sayian's requested accommodation would have imposed an undue hardship on Verizon and, if so, whether Verizon otherwise reasonably accommodated Sayian.

### 1.    *Whether Verizon Properly Denied Sayian's Requested Accommodation*

Verizon argues that assigning Sayian to the day shift as a COT—the only accommodation

acceptable to him—would have violated another employee's rights under the CBA and so it was not obligated to do so.  Id. at 3–7.  An employer is not required to provide an accommodation that is inconsistent with the contractual rights of other workers under a CBA.  Feliciano v. State of R.I., 160 F.3d 780, 787 (1st Cir. 1998).

Under the CBA's work scheduling provision, "[s]ubject to the requirements of the service, seniority of rating, or seniority of service where ratings are not involved, shall govern the assignment of day or night tours and/or hours assigned within those tours, in the work group involved."  D. 32-3 at 9.  The parties dispute whether this provision would have required Verizon to reassign another employee to a different shift in violation of that employee's rights under the CBA.  See D. 34 at 8–9; D. 36 at 2–3.

A collective bargaining agreement is treated as a contract susceptible to judicial construction.  Dasey v. Anderson, 304 F.3d 148, 158 (1st Cir. 2002); see Blackie v. State of Me., 75 F.3d 716, 721–22 (1st Cir. 1996).  If a contract is unambiguous then its interpretation is a question of law appropriate for determination on summary judgment, but if a contract is ambiguous then the parties' intent is a question of fact to be determined at trial.  Dasey, 304 F.3d at 158 (citing Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002)).  Contractual language is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  Id. (citing Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)).

Here, the CBA precludes Verizon from ignoring the seniority and rating-based system for assigning shift preferences to provide reasonable accommodations.  See D. 32-3 at 9 (stating that the seniority system "shall" govern shift assignments).  Sayian does not dispute that other union members with a preference for the day shift in the COT position were "rated" or were not rated

but had more seniority than him.  See D. 35 at 5–6 ¶ 18.  Instead, he argues that the CBA's qualification that application of the seniority system be "subject to the requirements of the service" would have permitted Verizon to assign Sayian to a COT day shift position as a reasonable accommodation despite the seniority system's requirements.  D. 34 at 8–9.  Sayian relies upon Torres v. Hilton International of Puerto Rico, Inc., No. 10-1190 (SEC), 2012 WL 2571293, at * 1 (D.P.R. July 2, 2012), in which the employer rejected the plaintiff's requested transfer because the CBA there generally required the employer to abide by a seniority system when making shift assignments.  The court denied the employer's motion for summary judgment in part because "the CBA nowhere established how [the employer] was to handle reasonable accommodation requests nor stated that those requests had to be denied when contrary to the general provisions of the seniority system."  Id. at *6.

Torres, however, did not address Feliciano in its analysis.  See id.  Moreover, the Torres CBA allowed the employer to depart from the seniority system in "exceptional circumstances," which the court found could permit an accommodation deviating from the otherwise-applicable seniority system.  Id.  By contrast, the CBA here states only that application of the seniority system is "subject to the requirements of the service," D. 32-3 at 9—that is, the phrase unambiguously does not permit Verizon to contravene the CBA to provide a reasonable accommodation as Sayian suggests:  such contemplates consideration for the needs of "the service," not for the needs of individual employees.  Reasonable accommodations, therefore, do not fall within the scope of the CBA's qualifying language.

Sayian further argues that a 2013 letter in which Verizon first accommodated Sayian by transferring him to the day shift supports interpreting the CBA as allowing Verizon to prioritize reasonable accommodations over the seniority system.  D. 34 at 9.  That letter noted that "[i]f at

any time Mr. Sayian does not meet seniority requirements for a day tour when accepting a bid/vacancy/transfer to another work group, he will be required to submit medicals for certification and the organization will review the request in an effort to accommodate the existing or any new workplace accommodation request."  D. 35-2.  Sayian contends that this language would not require him to work the evening shift if the seniority system otherwise prevented him from being assigned to the day shift but instead would allow for further discussion and an assessment of the medical necessity of any requested accommodation.  D. 34 at 9.  Sayian, however, ignores the qualifying phrase "when accepting a bid/vacancy/transfer to another work group," which evidences that Verizon intended to inform Sayian that he might not qualify for a different position under the applicable seniority rules but that Verizon would work with him to explore another accommodation.

Because assigning Sayian to the day shift as a COT would have required it to reassign another employee in violation of that employee's rights under the CBA, Verizon was not required to provide such assignment as an accommodation to Sayian.  See Feliciano, 160 F.3d at 787.

<em>2.   Whether Verizon Otherwise Provided a Reasonable Accommodation</em>

Verizon argues that it provided Sayian with a reasonable accommodation in 2018 when it granted him a leave of absence for several months and offered him a day shift position as a service representative.  D. 31 at 5.  Sayian contends that his transfer to the service representative position did not constitute a reasonable accommodation but instead amounted to an adverse employment action as a demotion.  D. 34 at 6–7.

The ADA "impose[s] an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee."  See Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 20 (1st Cir. 2004).  An employer, however, must offer only "a reasonable accommodation, not

11

necessarily the accommodation sought" by the employee.  Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 169 (D. Mass. 2004) (emphasis omitted).   A demotion may be an adverse employment action.  See Colón–Fontánez v. Municipality of San Juan, 660 F.3d 17, 42 (1st Cir. 2011); Gu v. Boston Police Dept., 312 F.3d 6, 14 (1st Cir. 2002); Yee v. Mass. State Police, 481 Mass. 290, 299 (2019).  A demotion, however, "can be a reasonable accommodation when the employer cannot accommodate the disabled employee in her current or prior jobs or an equivalent position."  Ford v. Marion Cnty. Sheriff's Off., 942 F.3d 839, 855 (7th Cir. 2019); Bruckhorst v. City of Oak Park Heights, 914 F.3d 1177, 1183–84 (8th Cir. 2019); Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir. 1998); see 29 C.F.R. § 1630.2(o)(2)(ii) (defining "reasonable accommodation" as including "reassignment to a vacant position").

As to whether the position was a demotion, the primary evidence Verizon advances—the compensation protection provided under the CBA—would only temporarily have maintained Sayian's compensation rate, see D. 32 ¶ 35, and would have been offset in part by fewer hours and no opportunity for overtime, having the effect of reducing Sayian's pay, see D. 35 at 15 ¶¶ 25–26, but there is also the fact that the service representative position would have changed Sayian's essential duties, D. 35 at 15 ¶¶ 21, 26; see Colón–Fontánez, 660 F.3d at 42; Gu, 312 F.3d at 14; Yee, 481 Mass. at 299.

Even assuming the position did constitute a demotion in this respect, the offered position qualified as a reasonable accommodation.  Sayian admits that the position's hours would have met his medical restrictions.  D. 35-1 at 21–22.  Further, Verizon was unable to accommodate Sayian in a COT day shift position given the restrictions imposed by the CBA, and the service representative position was the only available position that met Sayian's medical restrictions, see D. 32 ¶ 32; D. 35 ¶ 32.  Verizon, therefore, could not "accommodate [Sayian] in [his] current or

prior jobs or an equivalent position," which justified it assigning Sayian to a lower-grade and lower-paid position at the same office location during his preferred working hours to accommodate his disability.  See Ford, 942 F.3d at 855.  Thus, Sayian's transfer to the service representative position constituted a reasonable accommodation.

### 3.   Whether Verizon Engaged in an Interactive Process

Sayian also argues that Verizon failed to engage in an interactive process.  D. 34 at 9.  An "employer's failure to engage in an informal interactive process" can "constitute a failure to provide reasonable accommodation."  Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996); see Ralph v. Lucent Techs., Inc., 135 F.3d 166, 171–72 (1st Cir. 1998) (stating that "[t]he duty to provide reasonable accommodation is a continuing one . . . and not exhausted by one effort").   The ADA regulations, however, "envision an interactive process that requires participation by both parties."  Jacques, 96 F.3d at 514 (quoting Beck v. Univ. of Wis., 75 F.3d 1130, 1135 (7th Cir. 1996)).  "When a plaintiff employee rejects a reasonable accommodation offered by [the] employer, . . . [the plaintiff] is precluded from recovering under the ADA for [his] employer's alleged failure to provide a reasonable accommodation."  Bryant, 345 F. Supp. 2d at 168; see Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 104 (1st Cir. 2007) (concluding that employer's offering plaintiff a reasonable accommodation precludes him from now arguing "that the company should have offered something different").

Here, Verizon worked with Sayian to address his medical restrictions, including in 2013 when it provided him a day shift in his COT position when one was available and later in 2018 when it granted him a leave of absence and expressed that it was "open to exploring alternatives with [him]."  See D. 32 ¶¶ 9–10, 31; D. 35 at 3 ¶¶ 9–10; id. at 8–9 ¶ 31; D. 32-1 at 12–13.  Verizon did not make just "one effort" to provide reasonable accommodation, see Ralph, 135 F.3d at 171–

72, but demonstrated a continuing willingness to find a reasonable accommodation for Sayian's disability and ultimately provided one.  Moreover, Sayian himself insisted that he would only return to work on a day shift in the COT role.  See D. 32-1 at 12 (stating that "[t]he ONLY solution is to put [me] back onto my hired position on dayshift").

Sayian argues that Verizon's denial of his request to extend his leave of absence indicates its failure to engage in an interactive process.  D. 34 at 10.  Verizon, however, satisfied its obligation to provide Sayian with reasonable accommodation once it offered him the service representative position; it had no further duty to provide him with his preferred accommodation. See Bryant, 345 F. Supp. 2d at 168–69.  Thus, Verizon sufficiently engage in an interactive process and Sayian is "precluded from recovering . . . for [Verizon's] alleged failure to provide a reasonable accommodation."  See id.

In sum, Verizon was not required to assign Sayian to a COT day shift position in violation of another employee's rights under the CBA, it reasonably accommodated Sayian and it fulfilled its duty to engage in an interactive process.  Accordingly, Verizon's motion for summary judgment on Counts I and III is ALLOWED with respect to the reasonable accommodation issue.

## B.   Discrimination:  Adverse Employment Action (Counts I and III) and Retaliation (Counts II and V)

Sayian also claims that Verizon engaged in unlawful discrimination by transferring him to the service representative position, ending his short-term disability and ultimately terminating him. D. 1-1 ¶¶ 43–47, 53–60; D. 34 at 5.  He further claims that Verizon engaged in unlawful retaliation by taking such adverse employment actions against him.  D. 1-1 ¶¶ 48–52, 67–71; D. 34 at 12.

In employment discrimination and retaliation cases lacking direct evidence of discriminatory animus, such as here, courts apply the McDonnell Douglas burden shifting framework.  See McDonnell Douglas Corp., 411 U.S. at 802–05; Tobin, 433 F.3d at 104–05;

Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998); Verdrager, 474 Mass. at 406. The plaintiff first must present a *prima facie* case for discrimination or retaliation, then the defendant must articulate some legitimate, non-discriminatory reason for the allegedly adverse action and, if the defendant satisfies their burden, the plaintiff must prove that the articulated reason is mere pretext.  See Tobin, 433 F.3d at 104–05.

      1.     Whether Sayian Has Presented a *Prima Facie* Case for Discrimination

Sayian must present a *prima facie* case for discrimination.  See id.; Verdrager, 474 Mass. at 396.  To establish a *prima facie* case for disability discrimination, a plaintiff must show (1) that he suffers from a disability or handicap, as defined by the ADA and Chapter 151B, (2) that he was nevertheless able to perform the essential functions of his job with or without reasonable accommodation and (3) that the employer took an adverse employment action against him because of, in whole or in part, his protected disability.  See Tobin, 433 F.3d at 104–05.  A "plaintiff's initial burden of establishing a prima facie case is not intended to be onerous."  See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 45 (2005) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  Rather, it is meant to be a "small showing" that is "easily made."  Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (citations and internal quotation marks omitted).

Verizon does not dispute that Sayian suffered from a disability and that he could perform the essential functions of his job.  See D. 31 at 3.  The issue, therefore, is whether Verizon took an adverse employment action against Sayian due to his protected disability.  To determine if an employment action is adverse, courts "look for whether it has 'materially change[d] the conditions of plaintiff['s] employ.'"  Cherkaoui v. City of Quincy, 877 F.3d 14, 25 (1st Cir. 2017) (alteration in original) (quoting Gu, 312 F.3d at 14).  "These changes 'must be more disruptive than a mere

inconvenience'" and may include reassignments "if they involve 'significant different responsibilities.'" Id. (quoting Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016)).

Sayian claims three adverse actions:  first, his transfer from a COT position to a service representative position, which he characterizes as a demotion, D. 32 ¶ 32; D. 35 at 9 ¶ 32; second, the termination of his short-term disability benefits, D. 32 ¶ 31; D. 35 at 8–9 ¶ 31; and third, his termination from Verizon, D. 32 ¶ 41; D. 35 at 11 ¶ 41.  See D. 34 at 6–7.  For reasons discussed above, Sayian advances sufficient evidence—at least facially—to support that Verizon demoted him and that the demotion related to his disability.  Moreover, specific to the adverse employment action issue, Sayian argues that Verizon terminated his short-term disability benefits to force him to accept the demotion to service representative and ultimately terminated him from Verizon for his failure to accept that demotion.  D. 34 at 7.  Given the low threshold applied by courts at this stage in the analysis, Kosereis, 331 F.3d at 213, the Court assumes *arguendo* that Sayian has adduced a *prima facie* case of disability discrimination based upon his asserted demotion and the actions he contends Verizon took to force him to accept that demotion, including termination, see Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011) (stating that "termination of employment obviously is an adverse employment action").

### 2.    Whether Sayian Has Presented a *Prima Facie* Case for Retaliation

Sayian also must present a *prima facie* case for retaliation.  See Hodgens, 144 F.3d at 160; Verdrager, 474 Mass. at 406.  To establish a *prima facie* case for retaliation, a plaintiff must show that (1) he engaged in protected conduct, (2) he suffered an adverse employment action and (3) a causal connection existed between the protected conduct and the adverse action.  McMillan v. Mass. Soc. for Prevention of Cruelty to Animals, 140 F.3d 288, 309 (1st Cir. 1998); Mole v. Univ. of Mass., 442 Mass. 582, 591–92 (2004).  As in the discrimination context, a plaintiff's initial

burden to prove a *prima facie* case is not onerous.  See Kosereis, 331 F.3d at 213; Washington v. Honeywell Int'l, Inc., 323 F. Supp. 3d 309, 316 (D.R.I. 2018) (citing Kosereis in FMLA retaliation context).  A retaliation claim is separate and distinct from a discrimination claim and arises not from discriminatory treatment but rather from treatment that punishes an employee for "complaining of or otherwise opposing such discriminatory treatment."  Verdrager, 474 Mass. at 405.  Accordingly, "[a] claim of retaliation may succeed even if the underlying claim of discrimination fails.'"  Psy-Ed Corp. v. Klein, 459 Mass. 697, 706–07 (2011) (quoting Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 121 (2000)).

Here, it is undisputed that Sayian engaged in protected activity by requesting reasonable accommodation and that his transfer to the service representative position related to that request.  See D. 31 at 7–8; D. 34 at 12.  The issue, therefore, is whether Sayian's transfer to the service representative position and subsequent termination constituted adverse action.  The Court assumes *arguendo* that Sayian has adduced a *prima facie* case of retaliation given the low applicable threshold, see Kosereis, 331 F.3d at 213, the potentially adverse nature of Sayian's transfer to the service representative position and the actions Sayian contends Verizon took to force him to accept that transfer.

### 3.     *Whether Verizon Has Articulated Legitimate, Non-discriminatory Reasons*

Assuming Sayian has established *prima facie* cases for discrimination and retaliation, Verizon must articulate legitimate, non-discriminatory reasons for its actions.  See Tobin, 433 F.3d at 104–05; Hodgens, 144 F.3d at 160; Verdrager, 474 Mass. at 396, 406.  "The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Tex. Dep't of Cmty. Affs., 450 U.S. at 254–55 (citation omitted).

Verizon asserts several reasons.  First, it is undisputed that Verizon has for several years experienced staffing issues with respect to the COT position at the Taunton location and that these issues have required Verizon to rebalance the staffing of its COTs across the day, evening and night shifts.  See D. 32 ¶¶ 8, 11–12; D. 35 at 3–4 ¶¶ 8, 11–12.  Second, Verizon states that it transferred Sayian to the service representative position to provide him with a reasonable accommodation for his disability, as assigning Sayian to the day shift as a COT would have required it to reassign another employee in violation of that employee's rights under the CBA and no equivalent position was available.  D. 31 at 4, 6–7.  Third, Verizon states that it terminated Sayian's employment because he refused to report to work after Verizon advised him multiple times that he needed to do so or face termination.  D. 31 at 8; see D. 32 ¶¶ 32, 40, 41.  With these justifications, Verizon has satisfied its burden to "raise[] a genuine issue of fact as to whether it discriminated against" Sayian.  See Tex. Dep't of Cmty. Affs., 450 U.S. at 254–55.

### 4.    Whether Verizon's Stated Reasons Are Pretextual

To prevail on his discrimination or retaliation claims, Sayian must show that Verizon's stated reasons for its actions were pretextual.  See Tobin, 433 F.3d at 105.  To show pretext under federal discrimination law a plaintiff must adequately refute the defendant's purported non-discriminatory reasons for its actions and advance evidence of his own showing that the defendant's asserted reasons were a pretext hiding discrimination.  See id. (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (stating that the plaintiff "must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive" (citation and internal quotation marks omitted))).  Pretext may be proven by a showing of different treatment for similarly situated employees.  See Paul v. Murphy, 948 F.3d 42, 52–53 (1st Cir. 2020); Matthews v. Ocean Spray Cranberries, Inc., 426

Mass. 122, 129–30 (1997).  "[W]here elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994) (citations and internal quotation marks omitted).  Under Massachusetts law, "an employee may survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against him [or her] were not the real reasons for that action,' even if that evidence does not show directly that the true reasons were, in fact, discriminatory."  Verdrager, 474 Mass. at 397 (alteration in original) (citation omitted) (quoting Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 139 (1976)).

Even under the "pretext only" standard applied in Massachusetts, Sayian has failed to show that Verizon's stated non-discriminatory reasons for its actions were not the real reasons for its actions.  Sayian advances three arguments that Verizon's actions were pretextual.  First, Sayian contends that the CBA allows for deviations from the seniority system to provide reasonable accommodations.  D. 34 at 11, 13.  As concluded above, however, it does not.

Second, and relatedly, Sayian argues that the 2013 letter approving his return to the day shift as a reasonable accommodation reserved the possibility that the accommodation could remain in place based upon medical necessity even if the seniority system otherwise prevented him from working the day shift.  D. 34 at 11, 13.  As noted above, however, that letter addressed that Sayian might not qualify for a different position due to the applicable seniority rules and that Verizon would work with him to explore other accommodations.

Third, Sayian asserts that his termination itself implies pretext.  D. 34 at 11, 13.  Sayian, however, fails to refute Verizon's argument that it terminated him merely because he refused to report to work—and only after its repeated attempts to find a solution that would both

accommodate Sayian's medical restrictions and satisfy Verizon's duties under the CBA.  See D. 31 at 8.  Indeed, "[t]he basic idea of a reasonable accommodation is to enable an employee to work, not to not work."  Echevarria v. AstraZeneca, LP, 133 F. Supp. 3d 372, 399 (D.P.R. 2015), aff'd sub nom. Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119 (1st Cir. 2017).

Further, Sayian does not claim that Verizon treated him differently from any similarly situated employees.  See Paul, 948 F.3d at 52–53; Matthews, Inc., 426 Mass. at 129–30.  For all these reasons, Sayian has failed to show for his claim under state law that Verizon's facially legitimate reasons for its actions were not the real reasons for those actions, see Verdrager, 474 Mass. at 397, and certainly has failed to show for his claim under federal law that those reasons were "a sham intended to cover up [its] real motive [of discrimination]," see Mesnick, 950 F.2d at 824.  Accordingly, Verizon's motion for summary judgment on Counts I and III is ALLOWED as to the adverse employment action issue and its motion for summary judgment on Counts II and V, the retaliation claims, is also ALLOWED.

## C.    Intentional Infliction of Emotional Distress (Count IV)

Sayian claims that Verizon is liable for intentional infliction of emotional distress ("IIED") because it intentionally demoted Sayian and terminated him for failing to take the demotion knowing that he was likely to experience emotional distress, resulting in severe emotional distress and other damages.  D. 1-1 ¶¶ 61–66; D. 34 at 14.  Verizon argues that the Workers' Compensation Act, Mass. Gen. L. c. 152, bars Sayian's IIED claim and, even if it does not, that the undisputed record fails to support Sayian's claim.  D. 31 at 9–10.

### 1.    Whether the Workers' Compensation Act Bars Sayian's IIED Claim

The Workers' Compensation Act provides the exclusive remedy for workplace claims for personal injuries and bars common law claims that fall within its scope.  See Mass. Gen. L. c. 152,

§ 26.  The act's exclusivity applies where (1) the plaintiff is shown to be an employee, (2) the plaintiff's condition is a "personal injury" as defined in the act and (3) the injury is shown to have arisen out of and in the course of employment.  Brown v. Nutter, McClennen & Fish, 45 Mass. App. Ct. 212, 215 (1998).  It is well settled that any "suit for an intentional tort in the course of the employment relationship is barred by the exclusivity provision of the [act], unless the employee has reserved a right of action pursuant to [Mass. Gen. L.] c. 152, § 24."  Anzalone v. Mass. Bay Transp. Auth., 403 Mass. 119, 124–25 (1988) (holding that the act's exclusivity provision barred suit for intentional infliction of emotional distress against supervisor); Foley v. Polaroid Corp., 381 Mass. 545, 548–49 (1980).  Sayian acknowledges that his IIED claim is based entirely upon his employment relationship with Verizon and that he is not basing his claim on any acts that occurred outside of his employment relationship.  See D. 35 at 12 ¶ 44.  Moreover, he does not assert that he reserved a right of action under Section 24.  See generally D. 34.  The issue, therefore, is whether Sayian's claimed condition is a "personal injury" under the act.

The act defines personal injuries to include "emotional disabilities . . . where the predominant contributing cause of such disability is an event or series of events occurring within any employment."  Mass. Gen. L. c. 152, § 1(7A).  This definition encompasses Sayian's claimed injury of emotional distress.  See Foley, 381 Mass. at 550 (stating that "emotional distress arising out of employment [is] a personal injury under the act").

Sayian argues that, because Verizon's actions did not constitute "bona fide personnel actions," his claim is not barred by the Workers' Compensation Act.  D. 34 at 14–15.  The act's definition of "personal injury" includes a qualification that "[n]o mental or emotional disability arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination except such action which is the intentional infliction of emotional harm shall be

deemed to be a personal injury within the meaning of this chapter." Mass. Gen. L. c. 152, § 1(7A). From this, court have concluded that the legislature intended "to protect the employer from liability under the [act] for claims arising out of bona fide personnel actions unless motivated by an intent to inflict emotional distress." See Clarke v. Ky. Fried Chicken of Cal., Inc., 57 F.3d 21, 28–29 (1st Cir. 1995) (quoting Catalano v. First Essex Sav. Bank, 37 Mass. App. Ct. 377, 380 (1994)). This qualification, however, does not address IIED claims not arising from bona fide personnel actions, which the act equally covers. See Green v. Wyman-Gordon Co., 422 Mass. 551, 559–61 (1996) (holding that act barred IIED claim arising from alleged sexual harassment by employer); Stekeur v. Clark Univ., No. 011279C, 2001 WL 1763456, at *2 (Mass. Super. Ct. Dec. 2, 2001) (noting that "[c]laims for intentional infliction of emotional distress . . . are barred by the exclusivity provisions of the [a]ct whether or not they are the result of a bona fide personnel action").

　　To support his suggested distinction between bona fide personnel actions and other acts, Sayian cites Edwards v. Granite Techs., LLC, No. 19-cv-12330-ADB, 2020 WL 3577911, at *8 (D. Mass. July 1, 2020), which quotes Catalano for the proposition that "the key to whether the Workers' Compensation Act precludes a common law right of action has always rested upon the nature of the injury for which a plaintiff seeks to recover and not the nature of the defendant's act." See id. (alterations omitted) (quoting Catalano, 37 Mass. App. Ct. at 380); D. 34 at 14. Catalano, however, described this as the approach courts "[t]raditionally" applied to claims under the Workers' Compensation Act but contrasted that with the act's 1985 and 1986 amendments, which "ma[de] clear that when events occurring at work are a significant contributing cause of emotional or mental disabilities, those injuries are compensable under the [a]ct unless they arose from a bona fide personnel action not intended to inflict emotional distress." Catalano, 37 Mass. App. Ct. at

380–81.  Further, <u>Edwards</u> did not involve an IIED claim, and it quoted the above language from

<u>Catalano</u> in assessing whether the plaintiff's claim for negligent infliction of emotional distress

arose from her employment after already determining that the claim constituted an injury under

the act.  <u>See</u> <u>Edwards</u>, 2020 WL 3577911, at *8.  Sayian's argument, therefore, fails.

Accordingly, the Workers' Compensation Act bars Sayian's IIED claim.

### 2.    *Sayian's IIED Claim Otherwise Fails*

Even if the Workers' Compensation Act did not bar Sayian's IIED claim, the claim fails.

A plaintiff alleging a claim of IIED must establish (1) that the defendant intended to inflict

emotional distress or knew or should have known that emotional distress was the likely result of

the conduct, (2) that the conduct was "extreme and outrageous," (3) that the defendant's actions

caused the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was

severe.  <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144–45 (1976).  "The standard for making

a claim of intentional infliction of emotional distress is very high." <u>Polay v. McMahon</u>, 468 Mass.

379, 385 (2014) (quoting <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 195 (1st Cir. 1996)).  "Conduct

qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and

[is] regarded as atrocious, and utterly intolerable in a civilized community.'"  <u>Id.</u> at 386 (alteration

in original) (quoting <u>Roman v. Trs. of Tufts Coll.</u>, 461 Mass. 707, 718 (2012)).  "Liability cannot

be predicated on 'mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities.'"  <u>Tetrault v. Mahoney, Hawkes & Goldings</u>, 425 Mass. 456, 466 (1997) (quoting

<u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99 (1987)).

Even just considering the second element, Sayian fails to show that Verizon's actions rise

to the level of extreme or outrageous conduct.  Sayian argues that "evidence that Mr. Sayian

suffered significantly as a result of [Verizon's] actions" supports a finding of extreme or

outrageous conduct.  D. 34 at 15.  But even assuming Sayian's allegations, such does not support a finding of extreme or outrageous conduct as the element requires courts to look at the defendant's conduct, not the conduct's effect.  Sayian argues that Verizon failed to accommodate Sayian's disability and wrongfully terminated his employment.  See id. at 14–15.  Such conduct, however, does not "go beyond all possible bounds of decency" and cannot be "regarded as atrocious, and utterly intolerable in a civilized community."  See Polay, 468 Mass. at 386 (alteration omitted) (quoting Roman, 461 Mass. at 718); Lashgari v. Zoll Med., 84 Mass. App. Ct. 1106 (2013) (stating that defendant's alleged employment-related conduct of "pressuring the plaintiff to work additional hours, demoting him, and placing him on a performance improvement plan . . . rise nowhere near the level of outrageousness required for a successful IIED claim").

Accordingly, Verizon's motion for summary judgment on Count IV is ALLOWED.

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Verizon's motion for summary judgment, D. 30.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge